**FOR PUBLICATION**

UNITED STATES BANKRUPTCY
COURT DISTRICT OF NEW JERSEY
Caption in Compliance with D.N.J. LBR 9004-2(c)

In re VICTOR ACHINIVU,
        Debtor.

Case No. 17-30949 (MBK)

Chapter 13

Hearing Date: 2/18/2020

Judge: Michael B. Kaplan

Peter E. Zimnis, Esq.
Law Office of Peter E. Zimnis
1245 Whitehorse Mercerville Rd.
Suite 412
Trenton, NJ 08619
*Counsel for Debtor*

Edward L. Paul, Esq.
Paul & Katz, P.C.
1103 Laurel Oak Rd.
Suite 105C
Voorhees, NJ 08043
*Counsel for City of Trenton*

Albert Russo, Esq.
CN 4853
Trenton, NJ 08650-4853
*Standing Chapter 13 Trustee*

**MEMORANDUM DECISION**

This matter comes before the Court on a motion filed by the Debtor, Victor Achinivu ("Debtor"), seeking to enjoin the City of Trenton ("City") from initiating and prosecuting any municipal ordinance violations with respect to real estate properties owned by the Debtor and located in the City at 63 Tyrell Avenue and 114 Chestnut Avenue ("Motion"). The City has filed

opposition to the Debtor's motion and his efforts to enjoin the City from enforcing its property maintenance code.

The Court has reviewed the parties' submissions and has fully considered the arguments. This Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended September 18, 2012, referring all bankruptcy cases to the bankruptcy court. This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A) and 157(b)(2)(O). Venue is proper in this Court pursuant to 28 U.S.C. § 1408.

For the reasons set forth below, the Debtor's motion is DENIED. The following constitutes the Court's findings of fact and conclusions of law as required by FED. R. BANKR. P. 7052.[1]

**I.    Background**

The factual background and procedural history of this matter are well known to the parties and will not be repeated in detail here. In relevant part, the Debtor filed for relief under chapter 13 of the Bankruptcy Code on October 16, 2017. At the time of the filing, the Debtor owned real property located at 114 Chestnut Avenue, Trenton, New Jersey a/k/a/ Block 13101, Lot 49, Trenton, New Jersey and 63 Tyrell Avenue, Trenton, New Jersey a/k/a/ Block 1701, Lot 64, Trenton, New Jersey ("Trenton Properties"). The Debtor has not paid real estate property taxes on the Properties since 2011 and 2012, respectively, and the City undertook tax sales in which it attempted to auction tax sale certificates. Since there were no bidders, the tax sale certificate

---

[1] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

2

defaulted to the City of Trenton. During the bankruptcy proceedings, by order dated May 28, 2019, the City obtained relief from the automatic stay to pursue its remedies with respect to the outstanding real estate tax obligations. In addition, the claims register reflects a tax sale certificate held by Daxuan Wang concerning the property at 114 Chestnut Avenue, as well as additional secured claims by Trenton Water Works. The Debtor's initial bankruptcy schedules did not reference either of the Trenton Properties, nor the associated tax obligations. Furthermore, the Debtor's original chapter 13 plan, confirmed by the Court on February 8, 2018, did not provide for any treatment of the tax claims. After filing amended schedules on March 16, 2019, to include the Trenton Properties, the Debtor filed a modified plan which provided for the surrender of the Properties and which the Court confirmed on October 17, 2019.

Almost immediately thereafter, on October 26, 2019, the Debtor filed his Motion seeking injunctive relief against the City with respect to ongoing and future property maintenance code violations.[2] As of the filing of the Debtor's Motion, the City had issued a single Notice of Violation with respect to the property at 114 Chestnut, relative to overgrown vegetation and potentially poisonous weeds, in violation of City Ordinance 132-71.1(E). At the initial hearing on December 3, 2019, the Court heard preliminary oral argument and granted the parties permission to file supplemental submissions. The Court reviewed the supplemental submissions and entertained additional oral argument on the adjourned hearing date of February 18, 2020.

---

[2] At the initial hearing on the Motion, the Court noted that FED. R. BANKR. P. 7001(7) requires the filing of an adversary proceeding in order to obtain injunctive relief. Notwithstanding, the parties agreed to continue to treat the dispute as a contested matter, noting that there would be no need for further discovery or other procedural safeguards.

**II.     Discussion**

The Debtor frames the issue as whether this Court should enjoin the City's efforts to enforce its property code ordinances to ensure that the Debtor receives the "fresh start" envisioned by the drafters of the Bankruptcy Code.[3] The Court, however, views the issue somewhat differently—should the Court employ its equitable and statutory powers to absolve the Debtor from honoring his commitments to the community when he assumes ownership of real property. As discussed below, the Court must come down on the side of restraint and the simple answer is "no".

The Debtor seeks a permanent injunction with respect to the City's property maintenance enforcement efforts and, thus, the Court must first determine whether such injunctive relief is appropriate. With respect to a preliminary or permanent injunction, a plaintiff—or the Debtor in this matter—has the burden of proving the basis for a preliminary or permanent injunction. *See, e.g., Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 90 (3d Cir. 1992). The decision to grant a permanent injunction is within the equitable discretion of the court. *See Free Speech Coalition, Inc. v. Att'y Gen. United States*, 825 F.3d 149, 173 n.21 (3d Cir. 2016) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006)). To grant a permanent injunction, the Court considers whether the party seeking such relief has demonstrated the following:

---

[3] One of the primary purposes of the Bankruptcy Act is to "relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh, free from the obligations and responsibilities consequent upon business misfortunes." *In re Giarratano*, 299 B.R. 328, 333–34 (Bankr. D. Del. 2003), *aff'd,* 358 B.R. 106 (D. Del. 2004) (quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S. Ct. 695, 78 L.Ed. 1230 (1934)).

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*ebay, Inc.*, 547 U.S. at 391. This four-part test applies equally to applications for injunctions sought in the bankruptcy court. *See, e.g., In re Clark Entertainment Group, Inc.,* 182 B.R. 73, 80 (Bankr. D.N.J. 1995). Therefore, the Debtor bears the burden of demonstrating that the cited elements weigh in favor of granting the injunction. *See, e.g., Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139, 156 (2010) (quoting *ebay*, *Inc.,* 547 U.S. at 391). The Debtor has not met his burden.

Frankly, the Court need not go beyond the first two factors, to wit, a showing of irreparable harm and the lack of adequate remedies at law. The Debtor's Motion does not reference an allegation of an irreparable injury, much less proof of such an injury. At best, the Debtor suggests that being compelled to expend resources to pay fines and legal fees constitutes an injury that warrants an injunction. In an analogous context, the United States Court of Appeals for the Third Circuit determined that "the 'cost, anxiety, and inconvenience' of defending one's self in a good faith criminal prosecution does not constitute irreparable injury." *In the Matter of Davis*, 691 F.2d 176, 178 (3d Cir. 1982). The Third Circuit in *Davis, supra,* has provided guidance on the circumstances that merit imposing an injunction to stop the commencement or continuation of criminal proceedings.[4] A federal court is permitted to intervene only when the criminal complaint is "brought in bad faith or for purposes of harassment." *Davis*, 691 F.2d at 178. The Debtor has neither alleged, nor put forward evidence suggesting that the City is acting in bad faith or with an

---

[4] The Court is cognizant that the City's property maintenance enforcement efforts do not constitute criminal proceedings; notwithstanding, the analysis undertaken in *Davis, supra*, remains a proper guidepost for the Court.

5

intent to harass. As emphasized in *Davis*, principles of comity dictate that the Court presume that the City is prosecuting the alleged violation of the municipal property maintenance code, as well as potential future violations, in the interests of the public health and welfare. Such a course of conduct cannot, as a matter of law, constitute irreparable harm to the Debtor.

Much of the Debtor's argument is bottomed on a request for the Court to look beyond a rigid application of the established test for injunctive relief and engage in a fair weighing of interests in favor of the Debtor's "fresh start." The Court is willing to undertake this balancing of hardships and public interests because it does, in fact, strike at the heart of the four-part test. Unfortunately for the Debtor, the examination of competing policy concerns leads to the inescapable conclusion that the Motion must be denied.

A debtor's ability to surrender real property under a chapter 13 plan and to force a lienholder to assume immediately all ongoing and future maintenance responsibilities has been the subject of recent scholarly and judicial debate.[5] In the past several years, bankruptcy courts have

---

[5] As noted *in Bank of New York Mellon v. Watt*, 867 F.3d 1155, 1159, n.2 (9th Cir. 2017):

> In the wake of the mortgage foreclosure crisis, several courts have been confronted with the question of whether a debtor may require a creditor to take title to collateral, over that creditor's objection. *See, e.g., In re Sagendorph*, 562 B.R. 545 (D. Mass. 2017); *In re Brown,* 563 B.R. 451 (D. Mass. 2017); *HSBC Bank, USA v. Zair*, 550 B.R. 188 (E.D.N.Y. 2016), *appeal dismissed* Nov. 15, 2016; *In re Tosi*, 546 B.R. 487 (Bankr. D. Mass. 2016*); In re Arsenault*, 456 B.R. 627 (Bankr. S.D. Ga. 2011). Commentators have noted the lack of legal clarity on this question. *See, e.g*., Andrea Boyack & Robert Berger, *Bankruptcy Weapons to Terminate a Zombie Mortgage*, 54 Washburn L.J. 451, 469–73 (2015) (stating that "[t]he Code's provisions and the general equitable powers of a bankruptcy court can perhaps force a lender to take title") (emphasis added); David P. Weber, *Zombie Mortgages, Real Estate, and the Fallout for the Survivors,* 45 N.M. L. Rev. 37, 58 (2014) (describing the "creative attempts" that borrowers have made to "flee their zombie mortgages," which have given rise to legal disputes); Amanda McQuade, Comment, *The Antidote to Zombie Foreclosures: How Bankruptcy Courts Should Address the Zombie Foreclosure Crisis*, 32 Emory Bankr. Dev. J. 507, 526 (2016) (stressing the need for courts "to clarify the inconsistencies within the case law" regarding the validity of forced vesting).

addressed efforts by debtors to shift post-petition liabilities (such as condominium and homeowner association fees) and maintenance obligations through chapter 13 plans, which not only provide for the surrender of real estate, but the "forced vesting" of real estate in lienholders though application of 11 U.SC. § 1322(b)(9)[6] and 11 U.SC. § 1325(a)(5)(c)[7]. A critical factor for most courts which have allowed such provisions is whether the affected secured creditor timely objects to the proposed treatment.[8]

---

[6] 11 U.SC.§ 1322(b)(9) (b) provides, in pertinent part:

> (b) Subject to subsections (a) and (c) of this section, the plan may—
>
> \*\*\*
>
> (9) provide for the vesting of property of the estate, on confirmation of the plan or at a later time, in the debtor or in any other entity;

[7] 11 U.SC.§ 1325(a)(5)(c) provides, in pertinent part:

> (a) Except as provided in subsection (b), the court shall confirm a plan if—
>
> \*\*\*
>
> (5) with respect to each allowed secured claim provided for by the plan--
>
> \*\*\*
>
> (C) the debtor surrenders the property securing such claim to such holder;

[8] *See, e.g., In re Olszewski,* 580 B.R. 189, 193 (Bankr. D.S.C. 2017) (noting that secured creditor that does not object to the confirmation of a "vesting" plan, is deemed to have accepted the plan's treatment); *Wells Fargo Bank, N.A. v. Sagendorph (In re Sagendorph)*, 562 B.R. 545 (D. Mass. 2017) (overturning bankruptcy court's order confirming chapter 13 plan that vested the debtor's property into the secured creditor when the creditor objected to confirmation); *Bank of New York Mellon v. Watt (In re Watt)*, 2015 WL 1879680, 2015 U.S. Dist. LEXIS 54041 (D. Or. Apr. 22, 2015) (same); *HSBC Bank USA, N.A. v. Zair (In re Zair)*, 550 B.R. 188 (E.D.N.Y. 2016) (same); In re Malave, C/A No. 13–13348, 2014 Bankr. 5383 (Bankr. S.D.N.Y. Apr. 11, 2014) (finding that a plan providing for vesting of property to the secured creditor is not confirmable upon an objection from the secured creditor*); In re Weller,* 548 B.R. 392 (Bankr. D. Mass. 2016) (same*); In re Williams*, 542 B.R. 514 (Bankr. D. Kan. 2015) (same); *In re Tosi*, 546 B.R. 487 (Bankr. D. Mass. 2016) (finding that § 1322(b)(9) may not be used to vest property into the creditor and create a fourth option under § 1325(a)(5)); *but see In re Rosen*, C/A No. 11–23129, 2015 Bankr. LEXIS 4448 (Bankr. D. Kan. Feb. 24, 2015) (permitting vesting of property to a secured creditor upon confirmation after the secured creditor objected to confirmation).

In the present matter, there has been no consent to vesting title to the Trenton Properties in the City. Pointedly, the Debtor's confirmed plan does not include any "vesting" provisions; rather, the Debtor simply surrenders the Trenton Properties under his plan. As noted in *In re Sagendorph*, *supra*:

> The meaning of the word 'surrender,' whether used in the Bankruptcy Code or elsewhere, is plain and well-established in property law. *See, e.g., Tosi*, 546 B.R. [487, 492 (Bankr. D. Mass. 2016)] (finding the meaning of 'surrender' "settled and well understood," and listing four cases stating the same). Black's Law Dictionary defines 'surrender' as "[t]he giving up of a right or claim." (10th ed. 2014). Specific to section 1325(a)(5)(C), 'surrender' has been taken to mean the "'relinquishment of any rights in the collateral.'" *In re White*, 487 F.3d 199, 205 (4th Cir. 2007) (citations omitted); *In re Stone*, 166 B.R. 621, 623 (Bankr. S.D. Tex. 1993) (noting, "a number of bankruptcy courts called on to construe § 1325(a)(5)(C)" have "formulated" the same definition).

*Id*. at 552–53 (citations omitted). Thus, the Debtor's surrender of his interest in the Trenton Properties[9] under his plan serves merely as an offer to cede his property rights to the lienholders, and without acceptance by the City (through either affirmative action or silence in the face of a duty to object) does nothing to alter title and legal obligations relative to the properties. For sake of guidance to the bar in future disputes involving similar fact patterns, the Court emphasizes that had the Debtor included "vesting" language in his plan, the result would have been no different, and the Court would not have entered injunctive relief. The Court adopts the well-reasoned analysis by the district court in *In re Sagendorph, supra,* in determining that "vesting" cannot be undertaken in a unilateral fashion by a grantor, but rather requires actual acceptance by the

---

[9] The Court understands that there is a nondebtor co-owner with respect to the property at 114 Chestnut Avenue. In light of the Court's decision herein, there is no need to examine the impact of the requested injunctive relief on the City's ability to pursue enforcement actions against a nondebtor co-owner.

8

purported grantee in order to constitute a legal transfer of property. *Id*. at 553. At no time has the City accepted the Debtor's surrender of his property interests.

As the Bankruptcy Code fails to provide the Debtor with a statutory predicate for shifting post-petition maintenance obligations onto the City, the Court may still consider whether equitable considerations warrant judicial action to preserve the Debtor's "fresh start" in the face of competing public health and safety policy concerns. The Court is neither blind nor deaf to the expressed needs of a debtor seeking to move forward with positive steps towards financial health following a bankruptcy discharge. However, the Court must respect Congress's decision to place limits on a debtor's "fresh start" where required to serve the public interests. Congress has already undertaken the analysis required in this matter when it opted to included 11 U.S.C. § 362(b)(4)[10], which excepts from the scope of the automatic stay actions by governmental units to enforce its police or regulatory powers. In *Nortel Networks, Inc*., 669 F.3d 128 (3d Cir. 2011), the Court of Appeals explained that the § 362(b)(4) stay exception "discourages debtors from submitting bankruptcy petitions either primarily or solely for the purpose of evading impending governmental efforts to invoke the governmental police powers to enjoin or deter ongoing debtor conduct which

---

[10] Section 362(b)(4) provides that the filing of a bankruptcy petition

> does not operate as a stay—
>
> * * *
>
> > (4) [under § 362(a)(1), (2), (3) or (6) ], of the commencement or continuation of an action or proceeding by a governmental unit ... to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power.

would seriously threaten the public safety and welfare (e.g., environmental and/or consumer protection regulations)." *Nortel*, 669 F.3d at 137 (quoting *In re McMullen*, 386 F.3d 320, 324–25 (1st Cir. 2004)). "The common thread in the case law is that courts will find the § 362(b)(4) exception applicable when the governmental litigation (or other action) was triggered by the debtor's failure to comply with a regulatory obligation affecting public health, safety or welfare." *In re Iezzi*, 504 B.R. 777, 785 (Bankr. E.D. Pa. 2014).

On its face, the City's ordinance appears to promote significant and valid public safety and health goals; the issuances of notices and enforcement efforts to cure property maintenance violations are critical to ensure the welfare and safety of the community in which the subject properties are located. There can be no dispute that real properties with overgrown vegetation and strewn garbage impact the values of surrounding properties and place adults, children and pets in jeopardy of sickness and other harm. Certainly, the Debtor has not put forward any evidence of alternative motivations underlying the City's enforcement steps. This Court sees no reason, in law or equity to relieve the Debtor of his obligations as a property owner in his community.

**III.    Conclusion**

For the foregoing reasons, the Motion (ECF No. 60) is denied. The Court has entered a form of Order consistent with this opinion.

*/s/ Michael B. Kaplan*
Honorable Michael B. Kaplan
United States Bankruptcy Judge

Dated: February 25, 2020

10